**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL S ROMANO, II,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 3:16-cv-00348-GBC<br><br>(MAGISTRATE JUDGE COHN)<br><br>MEMORANDUM<br><br>Docs. 1, 9, 10, 11, 13, 19 |

## MEMORANDUM

### I.    Procedural Background

On August 10, 2011, and April 27, 2011, Michael S Romano, II ("Plaintiff")

filed as a claimant for Social Security Child's Insurance Benefits ("CIB") pursuant

to 42 U.S.C. § 402(d) and for supplemental security income (SSI) under Title II

and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1181-1183f.

(Administrative Transcript (hereinafter, "Tr."), 31).[1]  After the claim was denied at

the initial level of administrative review, and on April 2, 2013, Plaintiff and is

---

[1] Entitlement to CIB benefits requires that a claimant show, *inter alia*, that she became disabled before her twenty-second birthday. *Beety-Monticelli v. Comm'r of Soc. Sec.*, 343 F. App'x 743, 745 (3d Cir. 2009); 42 U.S.C. § 402(d); 20 C.F.R. § 404.350.  This is considered a "child's benefit" because it is paid on the parent's Social Security earnings record.  *See Holmes v. Astrue*, No. CIV. 09-5342, 2012 WL 893069, at *1 (D.N.J. Mar. 14, 2012).  Social Security Ruling states that "[i]n most title II childhood disability cases, a precise onset date need not be established as long as disability is found to have begun prior to attainment of age 22."  SSR 83-20.

mother, appeared and testified at an administrative hearing. (Tr. 73-88). The administrative law judge (ALJ) continued the hearing so that Plaintiff could obtain representation and a psychiatric evaluation. (Tr. 83). On July 29, 2013, the ALJ held a second administrative hearing, at which time Plaintiff was not represented. (Tr. 46-72). On September 3, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 28-45). On December 24, 2014, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 9-14). Plaintiff's request to extend time to file civil action notices was granted on January 21, 2016. (Tr. 1-2).

On February 25, 2016, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. (Doc. 1). On April 26, 2016, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings and on July 11, 2016, the Court granting Defendant's motion to correct the transcript. (Doc. 9, 10, 12, 14). On June 10, 2016, Plaintiff filed a brief in support of the appeal. (Doc. 11 ("Pl. Brief")). On July 8, 2016, Defendant filed a brief in response. (Doc. 10 ("Def. Brief")). On November 7, 2016, the Court referred this case to the undersigned Magistrate Judge, and both parties consented to the referral of this case to the

undersigned Magistrate Judge.  (Tr. 19).

## II. Relevant Facts in the Record

Plaintiff was born in June 1992 and had not attained the age of 22 as of the alleged onset date of January 1, 2011.  (Tr. 33); 42 U.S.C. § 402(d); 20 C.F.R. § 404.350.  Plaintiff alleged disability due to the following impairments: 1) bipolar disorder; 2) depression; 3) intellectual impairment; 4) autism; 5) attention deficit hyperactivity disorder (ADHD); 6) oppositional defiant disorder (ODD), and; 7) obsessive-compulsive disorder (OCD).  (Tr. 89-91, 111); Pl. Brief at 2.  Plaintiff completed the eleventh grade with the assistance of special education.  (Tr. 52, 77, 224).  He also testified that he had never worked, and that his mother and her boyfriend supported him financially.  (Tr. 78).

### A. Relevant Treatment History and Medical Opinions

### 1.  Christos Eleftherios, Ed.D.

On November 2, 2011, Dr. Eleftherios performed a consultative psychological evaluation.  (Tr. 279-84).  He came to the evaluation with his fiancée whom he had met through the internet.  (Tr. 279-80).  Plaintiff reported that he had received monthly treatment from Dr. Iuzukuo who prescribed Lamictal 100 milligrams a.m., Lamictal 150 milligrams h.s., Geodon 80 milligrams, and Adderall 30 milligrams.  (Tr. 280).  Plaintiff stated that the medications were

helping "A lot," and assed that he was trying to keep his anger under control." (Tr. 280). Plaintiff elaborated "[w]hen I don't take my medicine I will flip out for no reason." (Tr. 280). Plaintiff elaborated that when he became mad, he would go to his room and punch a wall and after he calmed down, he would apologize. (Tr. 280).

Plaintiff indicated that he did not have a license and did not drive. (Tr. 280). Plaintiff added that he would get a driving permit once his family believed that he would be responsible. (Tr. 280). Plaintiff stated that he had applied to jobs, but prospective employers would not hire him because of his "conditions" and elaborated that employers "discriminate against mentally challenged people." (Tr. 280). Plaintiff stated that he did not like "hanging out with anybody." (Tr. 280). Plaintiff's activities included playing video games, watching television, cooking "a little bit," helping with household cleaning, helping clean up after five dogs, doing laundry, and doing dishes. (Tr. 281).

Dr. Eleftherios noted that Plaintiff demonstrated evidence of immature speech and a "slight articulation problem but he could be readily understood." (Tr. 280). Dr. Eleftherios administered the Wechsler Adult Intelligence Scale-Third Edition, III (WAIS-III). (Tr. 281). Plaintiff obtained a Verbal IQ of 76, Performance IQ of 62, and Full Scale IQ of 67, which Dr. Eleftherios noted that

these results placed Plaintiff in the "upper limits of Mild Mental Retardation."[2]

Dr. Eleftherios opined that Plaintiff was somewhere between upper mild mental retardation and borderline intellectual functioning. (Tr. 281). Dr. Eleftherios explained:

> Verbal subtest analysis revealed poor vocabulary and poor abstract reasoning. Arithmetic reasoning was very poor and he had extreme difficulty mentally manipulating auditorally presented arithmetic symbols. Attention and immediate recall were fair - he recalled six digits forward and three backward - both with error. This was below average. His fund of information was fair this is generally obtained through education and environment. Comprehension was good; he evidenced pretty good practical judgment and was able to generate commonsense solutions to everyday problems likely indicating intellect probably closer to the borderline range.

> Performance subtest analysis revealed a poor alertness to his environment. He also had trouble on a new learning task requiring the ability to associate meaning with visual stimuli. He understood the task but performed slowly. Perceptual planning and organization abilities were poor; non-verbal abstract reasoning was very poor. He also had trouble comprehending perceptually and conceptually a total situation. Social sense was poor as was his ability to see cause and affect relationships.

> [Plaintiff] seemed to have significant difficulties with regards to intellect. A brief reading assessment indicated that his word recognition is at about the fifth grade level and likely overall he is probably closer to borderline intelligence. His achievement is

---

[2] Although the psychologists in this case referred to "mental retardation," the term "intellectual disability" has replaced "mental retardation" in Listing 12.05. See 78 Fed.Reg. 46499-01, 2013 WL 3936340 (August 1, 2013).

relatively good for the most part, but certainly well below his grade placement when he was in school.

(Tr. 282).

Dr. Eleftherios observed that Plaintiff was alert and able to respond to direct questions. (Tr. 283). Although his thinking was "slow," he was clear, logical, and goal directed, with no evidence of an overt or underlying thought disorder. (Tr. 283). There were no reported or observed hallucinations or delusions, he was oriented times three (to person, place, and time), he had some awareness regarding his ongoing learning difficulties, and he was not suicidal or homicidal. (Tr. 283). Although he described himself as antisocial, he had a girlfriend. (Tr. 283). Dr. Eleftherios assessed Plaintiff with: 1) likely borderline intelligence with learning disorder; 2) reported mood disorder with poor impulse control, rule out for probable bipolar disorder, and; 3) likely history of ADHD, combined type. (Tr. 283).

Dr. Eleftherios checked the boxes indicating that Plaintiff had slight limitations in his ability to understand, remember, and carry out short, simple instructions. (Tr. 286).[3] Dr. Eleftherios indicated that Plaintiff had moderate

---

[3] The form defined: 1) slight limitations as "[t]here is some mild limitation in this area, but the individual can generally function well"; 2) moderate limitations as "[t]here is moderate limitation in this area, but the individual is still able to function satisfactorily," and; 3) marked limitations

limitations in his ability to make judgments on simple work-related decisions, understand, remember, and carry out detailed instructions. (Tr. 286). Dr. Eleftherios indicated that Plaintiff had marked limitations in his ability to: 1) interact appropriately with the public, supervisors, and coworkers; 2) respond appropriately to work pressures in the usual work setting, and; 3) respond appropriately to changes in a routine work setting. (Tr. 286). In support of his opinion, Dr. Eleftherios explained that Plaintiff was avoidant, and had poor problem solving skills.[4]

### 2. State Agency Psychologist Psychiatric Review Technique and Residual Functional Capacity Assessment: Sandra Banks, Ph.D.

On November 17, 2011, Dr. Banks reviewed Plaintiff's records, which included the November 2011 opinion from Dr. Eleftherios, and rendered an opinion regarding the extent of Plaintiff's limitations. (Tr. 92-95). Dr. Banks found that Plaintiff's impairments did not meet the part "B" criteria under the relevant listings for mental impairments because he had a moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no

---

as "[t]here is serious limitation in this area. The ability to function is severely limited but not precluded." (Tr. 285).
[4] The remainder of Dr. Eleftherios' explanation is illegible. (Tr. 286).

episodes of decompensation, each of extended duration. (Tr. 94). Dr. Banks also found that the evidence did not establish the presence of the part "C" criteria under the relevant listings for mental impairments (Tr. 94). In support of her opinion, Dr. Banks cited to Plaintiff's IQ tests and the examination dated November 2, 2011, which noted that Plaintiff was cooperative, demonstrated immature speech, was intelligible, reported mood swings but apologizes, was simplistic, and dependent. (Tr. 94).

Dr. Banks opined that Plaintiff had no significant limitations in the ability to: 1) remember locations and work-like procedures; 2) understand, remember, and carry out very short and simple instructions; 3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 4) sustain an ordinary routine without special supervision; 5) work in coordination with or in proximity to others without being distracted by them; 6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 7) ask simple questions or request assistance; 8) accept instructions and respond appropriately to criticism from supervisors; 9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 10) be aware of normal hazards and take

appropriate precautions; 11) travel in unfamiliar places or use public transportation, and; 12) set realistic goals or make plans independently of others. (Tr. 96-97). Dr. Banks opined that Plaintiff was moderately limited in the ability to: 1) understand, remember, and carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) make simple work-related decisions; 4) interact appropriately with the general public; 5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and; 6) respond appropriately to changes in the work setting. (Tr. 96-97). In support of her opinion, Dr. Banks explained that although Plaintiff's "ability to understand and remember complex or detailed instructions is limited, he could be expected to understand and remember simple, one and two-step instructions," he would be able to maintain regular attendance, and he could be expected to complete a normal workday without an exacerbation of psychological symptoms. (Tr. 96-97). Dr. Banks added that Plaintiff was able to: 1) maintain socially appropriate behavior; 2) perform the personal care functions needed to maintain an acceptable level of personal hygiene; 3) ask simple questions; 4) accept instruction; 5) sustain a basic, repetitive routine and adapt to routine changes without special supervision, and; 6) function in production oriented jobs requiring little

independent decision making. (Tr. 97). With regards to Dr. Eleftherios' November 2011 consultative opinion, Dr. Banks opined that:

> While the examining source statements in the report concerning [Plaintiff's] abilities in the areas of making occupational and performance adjustments are fairly consistent with the other evidence in file, the examining source statements regarding his abilities in the areas of making personal and social adjustments are not consistent with all of the medical and non-medical evidence in the claims folder. The opinion provided by the examining source is based on a brief clinical encounter that does not provide insight that would exist from a longitudinal treatment history. The opinion is an overestimate of the severity of [Plaintiff's] limitations. . . . [Plaintiff] is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments.

(Tr. 98).

### 3. New Beginnings Outpatient Behavioral Health: Sheikh Afzal, M.D.

In a treatment plan dated January 29, 2013, it was noted that Plaintiff's abilities included computer playing and fixing and his strength was sports. (Tr. 305). Plaintiff reported experiencing problems with anger and depression and it was indicated that he would attend individual counseling once a month. (Tr. 305). Plaintiff was assessed with diagnostic code 296.80 (bipolar) and with a GAF score of 55. (Tr. 305).

On April 8, 2013, Plaintiff underwent a psychiatric evaluation. (Tr. 299-303). Plaintiff stated that he had been off his medication for a year and it was

noted that there were no old treatment records available at the time of the evaluation. (Tr. 299). It is noted that Plaintiff presented with ADHD, a learning disability, and mild autism. (Tr. 299). Plaintiff reported a history of impulsivity, depression, and aggression. (Tr. 299). Plaintiff reported past treatment included mood stabilizers, stimulants, and antidepressants. (Tr. 299). Plaintiff reported experiencing distractibility, inability to focus, inability to concentrate and comprehend, and that he was unable to maintain any employment secondary to ADHD. (Tr. 299). Plaintiff reported that he had seen a psychiatrist and counseling since the age of five, that he dropped out of the eleventh grade, and that he failed his GED. (Tr. 300-01). Dr. Afzal noted that Plaintiff's behavior was within normal limits, his speech was normal, his mood was dysthymic, his affect was mood-congruent, his thought process was goal directed, his cognition was grossly intact, his insight and judgment were fair, and that he was alert, with no evidence of suicidal or homicidal thought content, hallucinations, delusions, or obsessions. (Tr. 302). Dr. Afzal assessed Plaintiff with: 1) ADHD; 2) pervasive developmental disorder (PDD), not otherwise specified (nos); 3) bipolar disorder, depressed, and; 4) a Global Assessment of Functioning (GAF) of 55. (Tr. 302).[5] Dr. Afzal prescribed Lamictal and Wellbutrin, and recommended psychotherapy. (Tr. 303).

---

[5] *Schwartz v. Colvin*, 3:12–CV–01070, 2014 WL 257846 at *5, n. 15 (M.D.Pa. Jan. 23,

In a treatment plan dated April 13, 2013, Plaintiff indicated that his strengths included sports, a "good heart," and being smart. (Tr. 311). With regard to his abilities, Plaintiff stated that he could "fix anything." (Tr. 311). Plaintiff reported that he needed help dealing with loss, understanding "who I am," and "deal with depression." (Tr. 311). It was indicated that Plaintiff demonstrated minimal progress with regard to his goals and that his counseling was bimonthly. (Tr. 311).[6] Plaintiff indicated that he could talk with his sister, play video games, or go for a walk in order to cope with stressors. (Tr. 311). Plaintiff was assessed with a GAF score of 55. (Tr. 311).

On April 22, 2013, Dr. Afzal saw Plaintiff for medication management. (Tr. 298). Dr. Afzal noted that Plaintiff was taking Lamictal and Wellbutrin, with no

2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. .... A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

[6] The form had a range which included "-1 regression," "0 none," "1 minimum," "2 moderate," "3 significant," and "4 achieved." (Tr. 311, 314).

side effects; his impulse controls had been fine, and he denied verbal or physical aggression. (Tr. 298). Plaintiff reported doing "okay" and experiencing breakthrough ADHD symptoms, distractibility, poor attention span, anxiety, dysphoria, and a poor ability to focus. (Tr. 298). Upon examination, Dr. Afzal noted that: 1) he was cooperative and distracted; 2) his affect was appropriate; 3) his speech was clear and coherent with normal rate, volume and tone; 4) his thought process was goal directed; 5) he demonstrated no evidence of paranoia, delusions, or obsessions; 6) he denied auditory/visual hallucinations or suicidal ideations/plans; 7) his fund of knowledge was average; 8) he was alert and oriented to person, place, and time; 9) his insight, attention, and concentration were fair; 10) his recent and remote memory were intact, and; 11) his impulse control was normal. (Tr. 298). Dr. Afzal assessed Plaintiff with ADHD, and bipolar disorder, depressed. (Tr. 298). Dr. Afzal recommended adjustment of Plaintiff's medications and that plaintiff get psychotherapy from the New Beginning counselors. (Tr. 298).

On May 6, 2013, Plaintiff reported that his medications were working, and that he was less moody and angry. (Tr. 297). He also reported that he was taking care of his sister's four children. (Tr. 297). A mental status examination revealed that: 1) his appearance was within normal limits; 2) his behavior was within

normal limits; 3) his speech was normal; 4) his mood was euthymic; 5) his affect was mood-congruent; 6) he was alert; 7) his cognition was grossly intact; 8) his insight and judgment were fair, and; 9) his attention/concentration were normal. (Tr. 297). Plaintiff was assessed with ADHD, bipolar disorder, depressed, and assessed with a GAF of 55-60. (Tr. 297).

In a treatment plan dated May 22, 2013, Plaintiff indicated that his strengths were his family and friends and his ability is in sports. (Tr. 314). Plaintiff reported that he needed to deal with stress better and address anger and relationships. (Tr. 314). It was indicated that his goal progress was minimum. (Tr. 314). Plaintiff reported that not being able to express himself was a trigger for symptoms, and he could cope by talking to his sister, playing video games, or going for a walk. (Tr. 314). He was assessed with: 1) ADHD; 2) PDD, NOS, and; 3) bipolar disorder. (Tr. 314). Plaintiff was assessed with a GAF score of 55. (Tr. 314).

On June 11, 2013, Plaintiff reported that he was "doing good" and "working here and there." (Tr. 296). A mental status examination revealed that: 1) his appearance was within normal limits; 2) his behavior was within normal limits; 3) his speech was normal; his mood was euthymic; 4) his affect was mood-congruent; 5) his thought process was goal directed; 6) he was alert; 7) his cognition was grossly intact; 8) his insight and judgment were good, and; 9) his

attention/concentration were normal. (Tr. 296). Plaintiff was assessed with included ADHD, and bipolar disorder, depressed. (Tr. 296).

On July 23, 2013, Plaintiff stated that he played on the computer and spent time with his family. (Tr. 316). A mental status examination revealed that: 1) his appearance was within normal limits; 2) his behavior was within normal limits; 3) his speech was normal; his mood was euthymic; 4) his affect was mood-congruent; 5) his thought process was goal directed; 6) he was alert; 7) his cognition was grossly intact; 8) his insight and judgment were fair, and; 9) his attention/concentration were normal. (Tr. 316).

## B. Hearing Testimony

Plaintiff testified that he would get angry for no reason, and that he did not know what to do when "the depression kicks in." (Tr. 53). He had never had a full-time job. (Tr. 53). Plaintiff reported that he watched the news and cartoons on the television. (Tr. 55-56). He testified that he used the computer to keep up with friends on social media, that he met his girlfriend of ten months on social media, and that he gets recipes for his mother. (Tr. 56-57). Plaintiff used to read novels but did not read much anymore, although he used to read a lot because there was nothing else to do. (Tr. 61). He acknowledged that he could do simple addition and subtraction. (Tr. 61-62).

Plaintiff also testified that he helped his mother with grocery shopping, but said that he could not stand being in the grocery store because there are too many people around and it makes him nervous. (Tr. 59, 64). Plaintiff testified that he went to visit his nieces and nephews at his sister's house, and went to the movies with relatives. (Tr. 59). His chores included taking care of the backyard. (Tr. 62). He denied any physical problems and stated, "my whole body's healthy." (Tr. 62).

### III.     Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the

meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Weight Accorded to Medical Opinions

Plaintiff argues that substantial evidence does not support the ALJ's allocation of greater weight to the reviewing Dr. Banks' opinion than to the consultative examination opinion of Dr. Eleftherios.  Pl. Brief at 2-4.

For weighing all medical opinions, the Commissioner considers the factors enumerated in 20 C.F.R. §§ 404.1527(c), 416.927(c).  Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."  Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion."  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ may properly allocate greater weight to the consultative opinion of a non-examining physician who reviews a claimant's medical records than non-acceptable medical sources, provided that the ALJ adequately explains the grounds for this determination. *See e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir.1999); *Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir. 1996).

Substantial evidence supports the ALJ's reliance on Dr. Banks' opinion and allocation of less weight to the opinion of Dr. Eleftherios. When a physician's opinion is based on subjective, rather than objective, information, and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted.

*Morris v. Barnhart*, 78 Fed. Appx. 820, 824-25 (3d Cir. 2003) (some internal citations omitted). For the partial weight allocated to Dr. Eleftherios' opinion, the ALJ explained that:

> this opinion appears to be based primarily on [Plaintiff's] subjective complaints rather than objective findings. Specifically, while Dr. Eleftherios opined that [Plaintiff] had a marked restriction in his ability to interact appropriately with the public, supervisors, and co-workers, the record reveals that [Plaintiff] maintains a relationship with his girlfriend; visits with family regularly; goes shopping; and interacts with people on the computer through social media sites.

> It is also noted that, although the claimant attained a Verbal IQ score of 76; a Performance IQ score of 62; and a Full Scale IQ score of 67, Dr. Eleftherios opined that the claimant likely has borderline intelligence, with learning disability rather than mental retardation. Moreover, the claimant's low IQ scores are not consistent with his actual level of functioning as reported.

(Tr. 39-40).

Substantial evidence supports the ALJ's reliance on Dr. Banks' opinion over the opinion of Dr. Eleftherios. For the weight allocated to Dr. Banks' opinion, the ALJ explained that:

> It is noted that this opinion was rendered by a non-examining psychologist. However, it is fairly consistent with the record as a whole; with [Plaintiff's] treatment history; and with [Plaintiff's] reported activities, as set forth above. Given these facts, this opinion has been given great weight.

(Tr. 40) (internal citations omitted). The ALJ sufficiently supported the finding that Plaintiff was less than entirely credible. (Tr. 37-38). The ALJ observed that:

> Although [Plaintiff] reported and testified to limitations in his activities . . . it has also been reported that [he] is able to care for his personal needs independently; watch television; use the computer; play video games; help care for the family pets; and perform various household chores, such as cleaning, doing laundry, doing yard work, and shopping. The record also reveals that [Plaintiff] maintains a relationship with his girlfriend; visits with family regularly; and interacts with people on the computer through social media sites. . . . [A]lthough the record contains minimal evidence regarding [Plaintiff's] mental impairments, both treating and consulting sources have reported that [he] displayed appropriate appearance; fairly normal speech; denied suicidal or homicidal ideations; denied hallucinations or delusions; displayed no evidence of abnormal though content or process; and was cooperative.

> In terms of treatment, the record reveals that [Plaintiff] has been prescribed various medications relative to his impairments [and] has not reported experiencing any side effects from his medications and there is no evidence from any medical source of record that his

> medications have been frequently changed or the dosages altered due
> to side effects or ineffectiveness. . . . [T]he record contains little
> evidence relative to [Plaintiff's] treatment for his mental impairments.

(Tr. 37-38) (internal citations omitted).  It was reasonable for the ALJ to give

greater weight to Dr. Banks' who concluded that Dr. Eleftherios marked

restrictions were inconsistent with the record.  (Tr. 98).  Dr. Banks opined that Dr.

Eleftherios' "statements regarding [Plaintiff's] abilities in the areas of making

personal and social adjustments are not consistent with all of the medical and non-

medical evidence in the claims folder," that the Dr. Eleftherios' opinion was

"based on a brief clinical encounter that does not provide insight that would exist

from a longitudinal treatment history," and that the opinion "overestimate[s] . . .

the severity of [Plaintiff's] limitations."  (Tr. 98).  Dr. Banks concluded that

"[Plaintiff] is able to meet the basic mental demands of competitive work on a

sustained basis despite the limitations resulting from his impairments."  (Tr. 98).

The ALJ also noted that Plaintiff's GAF scores had "consistently been rated

between 55 and 60, indicative of no more than moderate symptoms or moderate

difficulty in social, occupational, or school functioning" and that there was "no

evidence that [Plaintiff had] ever sought or been recommended any inpatient

treatment for his mental impairments or that he has required frequent emergency

treatment." (Tr. 35, 38).

If a non-examining opinion is better supported, more consistent with evidence, or authored by a specialist, then it may be entitled to greater weight than examining or treating opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (non-examining consultants are "highly qualified ... medical specialists who are also experts in Social Security disability evaluation."); *Johnson v. Barnhart*, 89 Fed.Appx. 364, 368 (3d Cir. 2004). An ALJ may reject an examining physician's opinion in favor of a non-examining physician opinion on the basis of contradictory evidence. *See* 20 C.F.R. 404.1527(c); *Johnson v. Barnhart*, 89 Fed.Appx. 364, 368 (3d Cir. 2004); Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936 (ALJ may rely on non-medical evidence which is inconsistent with treating physician's opinion); *Torres v. Barnhart*, 139 Fed.Appx. 411, 414 (3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014).

Plaintiff fails to address the evidence in totality and she omits discussion of Dr. Banks' opinion. The ALJ extensively reviewed the record and considered all the credibility factors in totality of the evidence. (Tr. 37-38). Therefore,

substantial evidence supported the ALJ for according less weight to Dr. Eleftherios' opinion than to Dr. Banks' opinion given the totality of the evidence.

## B.    Listing 12.05

Plaintiff argues that the ALJ erred in concluding that Plaintiff's intellectual impairment did not meet the requirements of Listings 12.05.  Pl. Brief at 3-4.[7]  A claimant must establish each element of a Listing to qualify as disabled under a Listing.  20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies *all of the criteria in the listing*.") (emphasis added). As the Third Circuit has explained:

> For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 110 S.Ct. at 891 (emphasis in original). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* (emphasis in original).

---

[7] Plaintiff fails to specify which subsection of Listing 12.05 (A, B, or C) he believes he medically equals, thus would place the onus upon the Court to make the case for Plaintiff as to what subsection of Listing 12.05 best approximates Plaintiff's argument.  *See Mills v. Colvin*, 3:15-cv-01464-JMM-GBC, ECF # 19 (Apr. 20, 2016) at n.2.  The Court will address whether Plaintiff meets the requirements for 12.05(C) given that Plaintiff only directly addresses "additional and significant work-related limitation of function" and not all of the limitations enumerated in subsection (D).

*Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Thus, if there is one element that is not satisfied, the ALJ will have substantial evidence to conclude that a claimant does not meet a Listing. *See Williams v. Sullivan*, 970 F.2d 1178, 1186. Listing 12.05(C) requires:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ correctly observed that Plaintiff did not have a combination of significant work-related limitation of function given that Plaintiff was able to follow directions from family members, complete chores, video games, shop, and engage in social media. (Tr. 37-38).

Moreover, other instances in the record demonstrate Plaintiff does not demonstrate significant work related limitations of function. (Tr. 296-316). In a treatment plan review dated January 29, 2013, it was noted that Plaintiff's abilities included computer playing and fixing. (Tr. 305). On April 8, 2013, Dr. Afzal noted that Plaintiff's behavior was within normal limits, his speech was normal, his

mood was dysthymic, his affect was mood-congruent, his thought process was goal directed, and his cognition was grossly intact, his insight and judgment were fair. (Tr. 302). In a treatment plan dated April 13, 2013, Plaintiff indicated that his strengths included sports, a "good heart," and being smart. (Tr. 311). With regard to his abilities, Plaintiff stated that he could "fix anything." (Tr. 311). Plaintiff indicated that he could talk with his sister, play video games, or go for a walk in order to cope with stressors. (Tr. 311). On April 22, 2013, Dr. Afzal noted that: 1) he was cooperative and distracted; 2) his affect was appropriate; 3) his speech was clear and coherent with normal rate, volume and tone; 4) his thought process was goal directed; 3) his fund of knowledge was average; 5) his insight, attention, and concentration were fair; 6) his recent and remote memory were intact, and; 7) his impulse control was normal. (Tr. 298). On May 6, 2013, Plaintiff reported that his medications were working, and that he was less moody and angry. (Tr. 297). He also reported that he was taking care of his sister's four children. (Tr. 297). A mental status examination revealed that: 1) his appearance was within normal limits; 2) his behavior was within normal limits; his speech was normal; his mood was euthymic; 4) his affect was mood-congruent; 5) his cognition was grossly intact; 6) his insight and judgment were fair, and; 9) his attention/concentration were normal. (Tr. 297). On June 11, 2013, Plaintiff reported that he was "doing

good" and "working here and there." (Tr. 296). A mental status examination revealed that: 1) his behavior was within normal limits; 2) his speech was normal; his mood was euthymic; 3) his affect was mood-congruent; 4) his thought process was goal directed; 5) his cognition was grossly intact; 7) his insight and judgment were good, and; 8) his attention/concentration were normal. (Tr. 296). On July 23, 2013, a mental status examination revealed that: 1) his behavior was within normal limits; 2) his speech was normal; 3) his mood was euthymic; 4) his affect was mood-congruent; 5) his thought process was goal directed; 6) he was alert; 7) his cognition was grossly intact; 8) his insight and judgment were fair, and; 9) his attention/concentration were normal. (Tr. 316).

Given that not all of the elements of Listing 12.05(C) have been satisfied, substantial evidence supports the ALJ's determination that Plaintiff does not meet the Listing. *See Williams v. Sullivan*, 970 F.2d 1178, 1186.

## C. Waiver of Issue

Without any legal argument, Plaintiff's counsel states that although nineteen pages of evidence was submitted to the Appeals Council, the record "consists of only 12 of those pages" (Tr. 304-316). Pl. Brief at 6. Therefore, Plaintiff's

counsel attached "the remaining 7 pages as an Exhibit . . . ." Pl. Brief at 6.[8]  It

appears that Plaintiff may be asserting that the Court should consider evidence that

was not before the Appeals Council or the ALJ and that the Court should grant a

"Sentence Six" remand based upon new and material evidence.  *See Szubak v.*

*Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984).

Local Rule 83.40.4(b) requires that in social security cases, a Plaintiff's brief

"shall set forth . . . the specific errors committed at the administrative level which

entitle plaintiff to relief."  M.D. Pa. Local Rule 83.40.1.  Local Rule 83.40.4(b)

elaborates that "[a] general argument that the findings of the administrative law

judge are not supported by substantial evidence is not sufficient."  *Id.*; *cf. Phillips*

*v. Cnty. of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008) (explaining that Rule

8(a)(2) of the Federal Rules of Civil Procedure requires a 'showing,' rather than a

blanket assertion, of entitlement to relief and, as a threshold requirement, the plain

statement of pleadings must possess enough heft to show that the pleader is entitled

to relief).  Failure to adequately raise an issue results in its waiver.  *See Kiewit*

*Eastern Co., Inc. v. L & R Construction Co., Inc.*, 44 F.3d 1194, 1203–04 (3d

Cir.1995) (upholding a district court's finding that a party had waived an issue

---

[8] Defendant explains that the added evidence is in the transcript record.  Def. brief at.  21-23.
Plaintiff does not address this matter in a reply brief.

when a party only made vague references to the issue).  Given that Plaintiff failed to provide any legal argument, the Court concludes that Plaintiff waived the issue of new and material evidence.  *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.*, 44 F.3d 1194, 1203–04 (3d Cir.1995).

## IV.     Conclusion

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence.  Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.


Dated: May 3, 2017                            _____s/Gerald B. Cohn_____
                                                            GERALD B. COHN
                                                            UNITED STATES MAGISTRATE JUDGE